Case number 1933-42 John Doe v. Oberlin College Oral argument not to exceed 15 minutes per side Mr. Muha for the appellant Good morning. I am Chris Muha. I represent John Doe, the plaintiff appellant in this case. I have reserved three minutes for rebuttal. Very well. May it please the court. When schools discriminate on the basis of sex, they violate Title IX, and it doesn't matter if the reason that they're doing so is because they have a permanent ingrained bias against one sex or another, because they want to avoid liability from the federal government who's threatening to yank their funding, or because they genuinely believe that discriminating on the basis of sex is the right thing to do to achieve justice in a particular kind of case. As the Second Circuit noted in Columbia University, and as Judge Barrett recently noted for the Seventh Circuit, that is sex discrimination all the same, and it violates Title IX. And Oberlin, I think, shows us exactly how haywire things can go when schools choose to go that route. At the time period in question here, Oberlin convicted 100% of the students that Dr. Raimondo and her Title IX team sent through its formal process. Even in cases like John Doe's, where the evidence overwhelmingly contradicted the finding that was leveled against him, that decision cries out for an explanation, because the evidence can't be what explains it. Well, you've overstated it a little bit, haven't you? Weren't there over 100 complaints, and only 20 of those were referred to investigation, and only half of those actually had a hearing? So you're only talking about 10 out of 100. So that means, presumably, in the other 90 complaints, a lot of times the males were exonerated, right? Again, that is potentially what happened, but the question at this stage is, what is it plausible to infer? And is there a plausible inference that supports John Doe? I thought, just on the same factual point, I thought your complaint had an allegation to the effect that, in 80% of those cases, the complainant chose not to go forward. And so under this policy, the university would not make a determination whether to send it into formal proceedings. That's correct, Your Honor. Where in your complaint, do you recall? That is in the campus climate report that is incorporated into that complaint, yes. Those statistics come from Oberlin, and in a system that is complainant-centered by nature, it is at least plausible to infer that when the complainant says, I don't want this to go any further, that that's what happens. And then as to the other 10% that didn't go to a formal resolution, the other option at the school is informal resolution. And there, too, it is, again, at least plausible to infer that when that is what is requested, that is what Oberlin does. So the policy requires that they discuss the express preference of the survivor before deciding what to do. And Exhibit 1 to our complaint recounts an article when the policy was coming out and being discussed at the school, summarizing what Dr. Raimondo had been saying about it, and saying that it is indeed up to the students to decide which of these two resolution processes it may go through. So again, discovery will certainly confirm one way or the other what is true, but at this stage it is at least plausible to infer that the only cases that went through formal resolution are where the student asked for that, and that it wasn't because Oberlin was doing some sort of careful vetting process on the front end. And I think John Doe's case is probably a good, even further evidence of that, because here, to be found guilty of having forced someone to perform oral sex because she was too incapacitated to consent, it had to be clear to him that she, quote, lacked the rational ability to appreciate the conscious nature of what was going on and or was physically helpless. Those are quotes from Oberlin's policy, and they say likewise that being incapacitated means being unable to control your body, not understanding the who, the what, the when, the where, or the why of what you were doing. And there was absolutely no evidence that could have told John Doe she was in that kind of a state, even if she were. They had 80 minutes of consensual, coherent interaction. Does this all go to the first prong of the test, or does any of this go to the second prong? No, thank you. This goes to the second prong as well, and the reason is this, that substantial departures from the evidence is itself evidence of gender bias. And this was just recently clarified in, I think, really good detail in the Hofstra University case out of the Second Circuit. So there Hofstra was just emphasizing what Columbia University had already said, and what, again, in the equal protection context, Village of Arlington Heights said more than 40 years ago, which is that when you depart substantially from the standards that govern these kinds of decisions, that itself is evidence of bias. And again, I think the intuition there is if the evidence can't be what explains it, there must be something else at work here. And so Hofstra said when you have this kind of substantial departure from the evidence, you really only need a minimal amount of, say, pressure from the school or other kind of evidence coming from the outside. So there the plaintiff, I'm sorry, the school, Hofstra, had argued that... Does that mean the resolution of the second prong turns in part on how egregious the analysis was under the first prong, or how wrong the resolution was? In other words, it's a little funny to me because the second part is sort of an institutional approach and the first part of it seems to be sort of, in this particular case, was the result right? And so I'm not entirely sure how those are connected. I guess if you had a systemic pattern of cases where they were always departing from their settled procedures, that would be one thing. In a one-off case, if they have, I'm not sure how much that... It might be informative a little bit, but I'm not sure how much that helps on prong two. I think, again, the question does go in part to how far you are departing from the evidence in the case. If you think, well, I would quibble with some of how the evidence was analyzed here, maybe you say this is human nature, this is just bare human error, this isn't evidence of bias per se. But to quote Hofstra, when the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side without an apparent reason based in the evidence, it is plausible to infer, although by no means necessarily correct, that the evaluator has been influenced by bias. That's Hofstra? That's Hofstra, right? Which, again, is getting that from Columbia University, which, again, in this anti-discrimination law in general, this village of Arlington Heights sort of first laid out all these kinds of principles. And that, we would submit, is what happened here. There was 80 minutes of consensual activity, including making out and vaginal intercourse, before Jane Roe said- Can I ask you about some of the other systemic issues? Part of this case turns on the pressure that might have been placed on the university under Title IX, I think by the Department of Education or some federal investigator. Can you just talk about that a little bit? I want to understand that. Yes, absolutely. So two sources of pressure that Oberlin was under at the relevant time. First, like every school in the country, it was experiencing the undifferentiated pressure from the federal government to come down hard on especially claims of sexual assault brought by women against men. That is the pressure that was relevant in Miami University. And the reason given for it there was precisely that, that if you didn't appease the federal government, schools thought they might literally lose all of their federal funding. Was there something specific to Oberlin? That's sort of what I was- Yes, right. So what happens then with Oberlin is that targeted pressure, three months before the allegations against John Doe are made, that pressure gets directly targeted upon Oberlin. And they are told, we are going to conduct a systemic investigation of your sexual misconduct practices and how you respond to these kinds of things. And Dr. Raimondo had already sort of acknowledged this fear. She had said that summer that in her mind it was not a matter of if OCR came calling, it was a matter of when. So this kind of pressure that all the schools were under, she was very cognizant of. And as the Seventh Circuit noted, the fact that she is the Title IX coordinator and therefore has responsibility for compliance at the school, is reason to think that she may be experiencing that pressure in a way that others at the school don't. She wasn't the Title IX coordinator at the time of the hearing, was she? She was not, no. She wasn't part of the hearing panel, was she? She was not a part of the hearing panel, no. She was in charge of training everyone at the school from 2014, actually from 2013 before this policy was even adopted. She was the coordinator. She was the coordinator up until, again, you said July 1st of that year. Now training happens annually at the school. So on that fact alone, nine of the 12 months in which that panel would have had to have been trained would have been under her direct supervision as the Title IX coordinator. And she continued as the supervisor of her interim replacement during the time that he was sent forward into formal proceedings. Is that right? That's right. So the investigative report, the issuance of which triggers that decision, came out six days after she stepped down, or rather stepped up. She did continue to supervise her interim replacement, who, again, as an interim, I would submit it's not reasonable to think she's going to come in and she's going to change everything that the only Title IX coordinator under that policy had been doing for the last three years. I noticed the district court, Judge Solomon was the district judge? Judge Oliver, yes, that's right. Judge Solomon Oliver, I'm sorry, yes. And he agreed with you, I guess, to the point of there was probably enough proof of erroneous outcome here. But he disagreed, obviously, that there was enough to show the Title IX bias that's the second part of the test. Now where do you think he went wrong on that part? I think on a couple of things. I think probably most importantly, he never actually addressed the content of Dr. Raimondo's statements. So the other part of the evidence in this case is that Dr. Raimondo, when she was traveling and giving presentations with a group of panelists the summer before these allegations were brought, said that, among other things, they were talking about what they called the great middle area of cases between where someone is fundamentally incapacitated, passed out, and where someone is being chased down in an alley, where the question of consent is just obvious. But in between there, in other words, the vast majority of the cases that schools deal with, she said, I don't think it's appropriate to talk about these cases as being gray areas because that discredits quote, particularly women's experiences of violence. So what do you, I mean, I agree that that, well, my sense is that might be the most potentially problematic statement. You know, her statement that she's a feminist, I don't think that's a big deal. But how do you, so how do you translate that into bias in this proceeding or just generally at this school? Right, so what it does at a high level at least is it shows that when she conceives of consent, she does so through considerations of gender. And she is the one at the school who is tasked under the policy with training everyone on how to apply the policy's terms of consent and incapacitation. And I think one plausible reading, and again, there may be others, but one plausible reading of this is that traditionally the old trope is that if a woman doesn't resist to her utmost when she is being attacked, then she must have consented in some way. And I think maybe what she's getting at is saying that we need to get rid of that idea. And I think when you go too far with that, you have a decision exactly like here. But she would be right about that, presumably. Absolutely, but when you say, and I think the error, though, is in a case like this, what I think, and again, it's one plausible way she's doing this, when there is any evidence supporting someone's claim of assault, we have to find a way to get to credit that. Otherwise we're not doing credit to their experiences of violence. And that is what happened here. There was no evidence whatsoever that John Doe could have known she was physically helpless, unable to make rational decisions for herself. And yet he was found responsible and he was expelled. That's why it might be an erroneous outcome. But I'm looking, you know, at that panel discussion that everybody's looking at for Dr. Raimondo. She makes the following. What are the spaces, for example, for men to come forward and report gender-based harms? When our procedures assume that women are the only people who report, we shut down that space even further. So, I mean, that doesn't sound like she's biased  Not in favor, maybe not always in favor, but putting a thumb on the scale against one side or the other because of bias, whether it's racial or sexual bias. I guess my question is what is your sort of makes that plausible as opposed to just speculative? Makes it plausible, Your Honor, is that she herself has said, I bring considerations of gender to bear when I think about consent. And we have a decision here that seems to reflect that. So the decision itself, not only because it substantially departs from the evidence, but because of the way that it does so, marries up with this idea, again, one plausible way to interpret it. And I would submit if you have 53 pages of briefing and no alternative explanation of what this statement could mean, and they have the benefit of talking to Dr. Raimondo, they could have gone to her and said, What did you mean by this? And then put it into a brief and said, Here's one other way that you could read this. And that silence, I think, is very telling. One question before you sit down. What was the role of Batista, Dean Batista? This was an advocate appointed by the university? Yes. So at most schools, including at Oberlin, students who go into these processes are allowed to have an advisor. And if you don't bring your own, the school will often appoint one for you. Don't bring your own. In other words, is that typically a lawyer? At this time, yes. That is now required by federal law, that students be permitted to bring a lawyer into the process. But, again, many students are not able to do that. John Doe did not do that when he was at his hearing. Dean Batista works at the school. A little bit like appointing counsel in a criminal case. Not exactly. So this person is appointed to represent, and what does the advocate do? He's there to advise. Not permitted to speak at the hearing, but is there to sort of any questions that either party has, they can talk with their advisor, they can take breaks. Having done this myself, typically we're listening for questions that we might be able to submit when the time comes to do that. But at the hearing itself, the role is fairly limited, but still pretty critical because there are times when testimony differs. As it did here, where the only critical change that anyone made was made by Jane Rowan. In situations like that, it is very helpful to have an advisor. The change you're talking about is a change from what she told the investigator to what she said at the hearing with respect to whether she was physically coerced in this act? That's correct, Your Honor. Did the board have any comment? A close friend of hers tried to submit a note or something to the board disputing her change? Is that right? On appeal, that's right. On appeal. Yes. Her best friend, who she asked to accompany to her interview, said, like I was at the interview, he first of all said, she told me something different than even she said at the interview. But of note, what he said is she never made any allegation of force, and she said he asked. And at the hearing, she was directly asked, did he ask you to perform oral sex? And she said no. And on that, if I could add one more thing to that, that is the only disputed question of fact here that the board actually made a finding on, whether she was asked or whether she didn't. And as we talk about in paragraph 157, the decision in this case said there was not consent when asked to perform oral sex. They actually have to find Jane Roe effectively not credible in order to convict John Doe. Did the board have any comment in its opinion as to regarding this alleged change in her story from what she told the investigator to what she told the board? Did they have any comment on that? No, Your Honor. The word force, the allegation of force, is nowhere in the complaint. And again, the exact opposite. The predicate of her allegation of force was that there was never a question, and they come out the opposite on that point. Okay, thanks. You'll have your rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Aaron Herzig for Eppley Oberlin College. Title IX requires colleges to adopt policies and procedures to address sexual misconduct and to administer those policies and procedures in a manner without gender bias. That's exactly what Oberlin did here. Do you contest at all the first prong, erroneous outcome? For the purposes of the stage that we are in, no. We are not contesting the first prong. I do have, though, a number of things to say about the presentation we just heard, including about the pleading standard. One of the things that was just suggested is that we could have simply asked Dr. Armando a certain number of questions. Well, of course, we're at the motion to follow, so we can't do that. Dr. Bautista, who you asked about, Your Honor, they do not address the issue of Dr. Bautista in any of their briefings, so I think they've forfeited or forfeited anyway at that point for this purpose. Is it in the complaint? It is in the complaint, but they have not raised it as an issue in front of this court as one of the factors that you should consider. More importantly, though, Your Honor, the policy that is facially neutral that they did not put into the record that we did in our motion to dismiss briefing, at page 33 of the policy says that a student may choose their advisor. They can pick somebody from a list of the school. They can take someone who was appointed. They can bring a lawyer who can't act as a lawyer but can act as an advisor. So this student had the opportunity to pick anybody that he wanted at page 33 of the policy. So the idea that there was some problem with Dr. Bautista. Did he pick this person, or was this person appointed by the university?  Right, so the university has some obligation to appoint someone who will work in that person's best interest, I assume. It would be a good option, in other words, as opposed to having to pay a lawyer. Sure, but I agree with that. But we're talking about whether the policy was generally biased. Right, so the university has a policy. The policy says that we'll appoint someone for you if you don't pick someone. The university appoints someone, so the university has some obligation, I think, to make sure that that person is operating in the best interest of the student. Isn't that right? Yes, and I don't think there's any allegation that he was. Well, there's this tweet afterwards about to survivors everywhere, we believe you. Yes, Your Honor, and survivors, of course, can be male or female. There is no suggestion. Well, I mean, in the hearing he was advising the person who was being accused by the survivor. And there's no allegation that any of his advice was problematic. But, I mean, the fact that it was, I think, Ms. Raimundo appoints a person who, I mean, who would say that might itself be evidence of bias in this very proceeding. I disagree, Your Honor, that that would. Yeah, but it's 12B-6. I mean, we take a favorable to them view. It still has to be plausibly played, Your Honor, and so you would expect to see something like that. That's one thing. And Dr. Bautista gave me bad advice. There's no allegation along those lines. Well, it's one thing. I mean, one thing I'll say is there sometimes seems to be in the briefing, or perhaps inadvertently in the district court opinion, kind of a silo type analysis where just focusing on one piece of evidence that they cite and saying, that's not enough, and then you go to the next one. That's not enough. And there's never sort of a sense of, well, let's look at this collectively, which is what we're supposed to do, and does this get us over the line to plausibility, you know, just for purposes of 12B-6. I agree, and I would encourage you to look at it holistically, Your Honor. Now, what Appellant advocates and claims that Columbia University and Hofstra say is that there's some kind of sliding scale approach. You don't see that in any of the case law. The cases in this circuit, I think you've got four cases that really matter in this circuit. I think what he's saying, and you can tell me why you think it's unreasonable, is there's a certain threshold that one has to meet to satisfy the first prong, and you're not even contesting that prong here. But there can be a marginal difference. The allegations, the proof, can suggest a degree of egregiousness that goes far beyond the showing necessary to the first prong. And when that marginal difference is great enough, that difference itself can be evidence of bias in the particular proceeding. I mean, what's so contrary to common sense about that? Well, I think that would be a departure from what this court has done and what other courts have done. Erroneous outcome is one piece of it. We don't expect colleges to get it right every time. Well, suppose our precedent doesn't preclude this. Why is that an unreasonable inference? It's just about inferences. Well, it's about plausible pleading, Your Honor, and that is more than simply an inference. And it's implausible because the question is, was this particular proceeding biased against this man in this particular case? Well, let me ask you a question. Incapacitation, the university standard, it says the individual cannot make an informed and rational decision to engage in sexual activity because, in other words, for this particular reason, they lack conscious knowledge of the nature of the act or they're physically helpless. Examples of that in this are they're asleep, unconscious, otherwise unaware that sexual activity is occurring. How is that standard met here on the allegations in the complaint? Does the complainant lack conscious knowledge of the nature of the sexual act? Is she asleep, unconscious, unaware that sexual activity is occurring? How do you reconcile the record, at least as they allege it, with your own standard? Your Honor, what the panel found was that, essentially, when she said, I'm not sober, that consent ended at that point. And I think what's really important as to that second prong, which I think is very important. That satisfies this standard? Yes, Your Honor. That's what the panel found is that she no longer had conscious knowledge. The whole point of the standard is that you're not able to give consent or not give consent because you're incapacitated. So if you're even having that discussion, it seems it's completely cut against the idea that you're incapacitated, which I've just been totally confused about the standard the universities adopted. I think that overstates it a little bit, Your Honor, because I think when someone says no, that ends consent. Well, this isn't about consent. This is about the inability to even give consent or not give consent because they lack consciousness. It's the lack of conscious knowledge. Are you really saying that this is a lack of conscious knowledge of the nature of the sexual event? I mean, this isn't a 50 or whatever hour-long encounter. Are you saying there was no knowledge of the nature of the event? Really? So, Your Honor, that's what the panel found, number one. Number two, we're not there yet, Your Honors. But the point is, if that is extremely hard to reconcile with the evidence at least alleged in the complaint, maybe there was a problem. Your Honors, the question on that second prong is whether there was bias, whether there was gender bias here. There evidence of that is all about the first prong, whether the outcome was wrong. Not all about that. Well, I think it was, Your Honor. What about the 100 percent conviction rate? Now, you say that doesn't matter because 80 percent of the time it doesn't go forward. But my understanding of the record here is that 90 percent of the time it doesn't go forward. My understanding of the record, and you have to sort of take their complaint as you find it, is that in 80 percent of the cases, the complainant does not want action. And so that is the reason. Not the school's own judgment. That's the reason it doesn't go forward. We're not going to put that in the denominator and judge in determining whether when the university does make a decision they're being fair, right? I point to Your Honor. Right? I mean, would you put the 80 percent where the school's not making a decision? Is that relevant? Is that in the denominator? I do think it's overstating it to say it has no relevance. Why? I think this is all part of a Title IX process. And if in that process students decide not to come forward, I think you ---- No, they come forward, but they choose not to take action for whatever reason. Why do you get credit for their decision not to take action? You're being fair to the accused. I don't really track that. I would argue, Your Honor, that the Title IX program is starting to weed out real complaints from not real complaints. And so I think you do give it some credit. It's alleged to be the complainant's decision, not your weeding out. Understood. And I would point you to the idea that only 50 percent of investigations end up in hearing. But how about 100 percent conviction rate? Every single person who goes in there, nobody comes out. I mean, is that just irrelevant? Or together with some of these other things, does that allow somebody to infer that maybe there's at least a thumb on the scale, even if it's all well-intentioned? I don't think that's what these facts add up to, Your Honor. I think if you look at Miami University as an example, that's a strong contrast to what we have here, where they were moving everyone from complaint through investigation to hearing and finding of responsibility. We don't have those facts here. I think this fits more squarely in cases from the circuit like Dayton and Cummins. Miami University and Baum both, by the way, talk about, and I'd like to talk about for a minute, the idea that you need a particularized causal connection to this particular case. What is it here that says that we got it wrong, not because we got it wrong, but because of gender bias? How about they don't even comment on the change in the story? That would seem to be similar to Baum, where the university discredits the fraternity brothers because of that relationship with the accused, but they believe the sorority sisters, notwithstanding a similar relationship. Just sort of an oddity. Now, isn't that an oddity, that the board would not even comment on a rather important change? A couple of things, Your Honor. First of all, they credit and discredit testimony from witnesses for both sides, men and women. That's pled. Men and women, the reporting party and the responding party, they don't credit her testimony regarding force. They just don't decide on that ground. Right. Well, that's the same as not crediting it, I think. But they don't even comment. If one is assessing the credibility of a witness, typically that, too, is sort of a holistic assessment. And if somebody has this rather dramatic change in their story from the story that's in the complaint itself, what was told to the investigator, normally one might comment on that in determining whether this is a credible accusation. Here, Your Honor, I think the lack of comment, the lack of deciding on that basis speaks volumes. It certainly is a dramatic contrast to Baum in Miami in cases like that where you're absolutely right. You credit only male testimony. You credit only the reporting party. Or in Purdue, the Judge Barrett case that my colleague talked about where there's crediting only the testimony of one party, not calling the reporting party to testify live. Can I ask you another procedural question about this case that might speak to broader policies? Sure. There was an appeal. I think some of the things Judge Kethledge was asking about were part of an appeal where one of the main people, her friend changed, said that the accuser changed her story. And it looked like the appeal was rejected sort of formalistically. How does that appeal? So does everyone get a right to an appeal? Yes. There are standards for the right to appeal, including bringing up new evidence. Can I finish? Sorry. New evidence was brought up here, and it looked like it was sort of rubber stamped. I'm not sure if there's how thorough that appeal is, or can you tell me sort of how that process works? I don't think it was rubber stamped, Your Honor, but this wasn't new evidence. This is all evidence. Can you just tell me how the process works? Can you just answer that? Sure. He's entitled to an appeal shortly after the decision. An appeal officer looks at the nature of the appeal and the three factors and makes a determination whether the appeal should go forward. Is there a hearing? No, Your Honor. And does the 100 percent rate carry over to the appeal? In other words, has there ever been appeal granted? I don't know, Your Honor. What is the advisor, that advisor particular person, what was that person's role at the university at the time? Dean Bautista, Your Honor. Who was the advisor? Dean Bautista was the advisor. Again, they don't raise it. I don't know if it was a man or a woman. Okay, so it was the dean of the university. A dean of a college, not the dean of the entire university. Well, all right. Well, a dean of what college? I don't have that information. All right. We can chase that down. In part because they don't address it in their appeal briefs at all, which to me is forfeiture of that issue, is one of the ones that you should consider. Oh, we can sort that out. Just on a totally different topic, you know, the district court also dismissed the state law claims of negligence, breach of contract on supplementary jurisdiction, but there was diversity here. So is the district court at least wrong on that? Would we have to remand at least for the state law claims? We miss that, Your Honor. The way it's pled, they plead federal jurisdiction, diversity jurisdiction in one paragraph, and then the next one say there is supplemental jurisdiction over the state law claims under 1367. And so I think all sides missed that in two motion to dismiss rounds of briefing. 1367 was a head fake, I guess. It was in the complaint, Your Honor. What I would also say about that, though, Your Honor, is that those things, those claims basically follow on. They are fully briefed below. It is de novo review. So if Your Honors wanted to, I think you could reach that. But, yes, I think we all missed that. Can I ask you about the federal investigation by OCR? So your friend on the other side described sort of three months before, I think, the resolution of this case, the university has put on notice that it was sort of under the spotlight from OCR. Do you dispute any of that? Yes, Your Honor, for a couple of reasons. One, I don't think they were under the spotlight. They were one of a handful of universities. The one article they cite, too, talks about a number of other universities that were under investigation. They received a special communication from OCR that not every university was receiving. They had, Your Honor. One thing I would also say, though, is I would encourage you to watch the video of Dr. Raimondo again and the Yale Magazine transcript because some of what's represented here doesn't tell the whole story. I don't know. Are you answering my question still? I am, on that point, Your Honor. My colleague suggests that Dr. Raimondo was concerned about OCR. In fact, what she says with the head of OCR sitting next to her is, we welcome that kind of investigation. We're trying to do this right. So to the extent we're talking about what was in Dr. Raimondo's head about whether these investigations were important, she says in the panel discussion, not that she's concerned about it, but that she welcomes it, she thinks it will help them do better. So I don't think it's a particular. We're talking about what's subjectively in her head. I guess we can agree it's in her head at the time. Well, sure, Your Honor. Every Title IX coordinator. I mean, what's also in their heads is all of the suits challenging. I mean, right there is a bevy of these suits that push both ways at this point. You know, I must say that one aspect of the red brief in this case made me think that it perhaps was telling. On the question of incapacitation, the red brief, your brief, nothing personal, but the red brief does seem to cherry pick some of the testimony, particularly the part about she wasn't speaking in coherent sentences and the other one about she was out of it. I mean, those same witnesses, if you look at the totality of their evidence, there's a lot of other stuff there that would seem to be quite favorable to them. And to argue to us on a 12B6, this sort of cherry picked, you know, she said the complainant was out of it, and we're going to run with that and affirm a 12B6 dismissal, I mean, that's just fundamentally contrary to what we do on 12B6. And why isn't that kind of telling about, you know, the challenges you face in this appeal? I don't think that is what you do, Your Honor, in these cases. I think even Baum and even Miami, which are their best cases, do not say that at this stage you look at how good or bad the outcome was. They look at whether there was gender bias. But we don't, you know, but you're really not answering the question because we don't cherry pick testimony and read it in the light most favorable to the defendant. That's what you're doing in your brief. You look at that testimony in the light most favorable to you, and it's the opposite of what we're supposed to do. Now, maybe it's not a huge deal, those particular witnesses, but it's just it's not what we do on 12B6. I was not attempting to evade your question. Oh, I know, I know. I'm not attributing anything bad to you. What my answer is is that. . . That's your hand. It's your hand. Yeah, but. . . In terms of cards, you know. Oh, no, I understand. The point is that all of that goes to whether the outcome was erroneous. What we haven't had a chance to talk about here is what bias infected this proceeding. And in every case you've seen, Baum, Miami, any of the number of cases that they would cite, everyone cited in Baum, there was a particularized bias on behalf of a panel member or something in the procedure where, as you point out, they believe one, not the other. There's something unique to the case. There is none of that here. They may have gotten it wrong. No. But that isn't good enough to survive a 12B6 in these kinds of Title IX cases. Okay. No, I appreciate that. We have gone a ways over. Are there any more questions? All right. If I may just close briefly, Your Honor. Take 30 seconds. Oberlin's job is to care for all of its students, and it does that through an unbiased process that attempts to get it right. Its job is not to get it right every time. Its job is to be unbiased, and we think it did it here, and that Judge Oliver got it right. So we ask that you affirm. Thank you. All right. Thank you, Mr. Herzig. We will hear rebuttal. I'd like to address two things. First, I want to briefly talk about whether Dr. Raimondo welcomed an OCR investigation. I think if that's true. Whether she what? Whether she welcomed an OCR investigation. Raimondo may not be the strongest part of your case. I mean, I know it gets a lot of air time, but go ahead with what you want. I don't fully disagree, Your Honor. I'll just say that if she did, in fact, welcome an OCR that was pressuring schools to resolve these cases a certain way, I think that only suggests more bias in the process, not less, if she's already sort of on board with pressure that, in other cases, is evidence of gender bias. I'm glad to hear Oberlin say that the panel did not rely on an allegation of force, as they said explicitly on page 47 of their brief. And I think that goes to, again, some of your other questions about the evidence of incapacity here and whether anything close to that definition was satisfied. And just to start with that, her allegation there of force. Her allegation was that she grabbed her head and forced it onto his penis and that she physically resisted to the point that it hurt her neck. So she knew what was happening. She knew she didn't want it to happen, allegedly, and she tried to resist it. That in itself, I think, proves that she was not incapacitated. So, again, Oberlin, the panel actually had to find her not credible in order to get the result in this case. And there is a lot of other evidence, too, showing that she fully understood the nature of what was happening. And I'll just point you to one. It's paragraph 98. It's her own investigation testimony saying that the sex, the vaginal intercourse they were having, was painful and that the reason she asked him to stop was because she was dry down there. And this is when she says, I'm not sober. So she knows what's going on. She knows it's not painful. She knows why, and she explains why to him. Well, I think we're all in agreement, sort of, that there was enough to get by erroneous outcome. It's the second part of the test. But what particularized facts here tend to show it's plausible that there was gender bias? That's what your hurdle is here, right? So I would dispute first, as a legal matter, whether there has to be something in the outcome itself showing that kind of bias. And I think Lynn University is probably the best example of that, that Baum relied on, as providing sufficient evidence of bias. But here, the rationale itself, as divorced as it is from the actual evidence, is exactly the kind of evidence of bias in the actual proceeding here. And again, sort of to analogize it to Judge Barrett's decision, there she said the strongest piece of evidence of bias was the decision to credit one side over another. Now, someone in Oberlin's shoes would say, well, that's just pro-complainant bias. That's not gender bias. But there was no good basis for doing it because they hadn't seen her. And so again, one plausible reading, even if there are others, is that it was gender bias. The same I would submit is true for this decision. It is so far divorced from the facts that one plausible reading of why, even if there are others, is gender bias. That is all the court has to decide, and all Mr. Doe asks is for discovery to go and find out if that's the case. Very well. Thank you both for your arguments and your fine briefs in the case. The case will be submitted.